# Ege's Appeal.

A father having conveyed to his son certain real estate as his portion,·added to the deed this clause : " It is understood by the parties that this deed is to operate as a complete and mutual bar, release and discharge of all claims and demands up to the date, including all transactions and debts of whatever nature." Held, that this shall not be construed to release the estate of the father from the payment of a sum of money which the son, as guardian of a minor child, had loaned to his father.

The son having become the administrator of his father's estate, is not entitled, under the circumstances above stated, to a credit in his administration account for the payment of an incumbrance which existed upon the estate thus conveyed to him by his father.

APPEAL from the orphan's court of *Cumberland* county by John B. Gibson, Esq. and Mary Ege, executors of Michael Ege, Jun., who was one of the administrators of Michael Ege, Sen.

In obedience to a citation issued at the instance of the heirs, appellees, Mary Ege and John B. Gibson, Esq., executors of Michael Ege, Jun., filed an account of his administration of the estate of Michael Ege, Sen. deceased, to which exceptions were filed : the account was referred to an auditor, who reported the facts; and on his report the decree of the orphan's court was founded.

Michael Ege, Sen. owned four iron-works, viz. Carlisle, Holly, Cumberland and Pine Grove, and had five children, viz. Peter, Michael, George, Mary and Eliza. Intending to divide and arrange his estate among them, and to give each son an advancement of 100,000 dollars, he prepared deeds for them, none of which was delivered except that to Michael, which is dated the 3d of June 1815. It conveys the Carlisle works for the price of 148,020 dollars, in fee, by the usual terms " grant, bargain, sell, alien," &c., and after describing the several tracts of land, containing seven thousand one hundred and thirty-six acres and ninety-two perches, it proceeds, " together with all the stock, cattle, furniture, now in the grantee's possession or occupancy, connected with the Carlisle iron-works, waters, water courses, rights, liberties, privileges, hereditaments and appurtenances thereto belonging, or in anywise appertaining, and the remainders and reversions, rents, issues and profits thereof, and all the estate, right, title, claim, interest, use, occupation, demand and possession" of the grantor; to have, &c. " subject to the payment of the purchase money and interest thereon, due to the commonwealth." It releases the sum of 100,000 dollars of the price, and pledges the premises for the remaining 48,020 dollars, which the grantee covenants to pay ; one half on the day, and the residue in four equal yearly payments. " It is understood by the parties that this deed is to operate as a com-

plete and mutual bar, release and discharge of all claims and demands up to the date, including all transactions and debts of whatever nature," except the 48,020 dollars.

The auditor's report sets out, "balances on the books at Carlisle works on the 3d of June 1815, and received after that date by Michael Ege, Jun., against thirty-seven persons, amounting to 1413 pounds 13 shillings 1 penny, and balances due to twenty-five persons, and paid by Michael Ege, Jun. after that date, 311 pounds 5 shillings 8 pence, making a balance of 1102 pounds 7 shillings 5 pence, say 2939 dollars 65 cents.

Whether the accountant, M. Ege, Jun., is chargeable with this sum received by him from the accounts of the Carlisle works prior to the 3d of June 1815, beyond what he paid out, will depend on the following facts:

In the beginning of the year 1815, M. Ege, Sen., who then lived in Carlisle, declared to George Ege that he intended to give to each of his sons the property on which they lived: Cumberland to Peter, Holly to George, and Carlisle to Michael; that each was to receive property to the amount of 100,000 dollars. That as Carlisle works were estimated at 148,000 dollars, Michael would have to pay 48,000 dollars; Peter also would have something to pay; and George, as the Holly works were not worth 100,000 dollars, something to receive. He said that Peter, George and Michael were to get the stock at their respective works, and receive the debts that were due to them, and pay those that were owing by them. He told the same to his son Peter Ege, with this difference: he said that Michael was to pay all the debts of the Carlisle works, and receive all except John Miller's, which was not included. That George and Michael were about to erect furnaces. After this George carried on Holly works as his own; paid and received the debts of the place; and began in the spring of 1815 to build a furnace there. Michael did the same; paid and received debts, and began the same spring to build at the lower or Carlisle works. At a vendue of personal property at Cumberland in April 1815, Peter was directed by his father to take the notes for the goods sold in his [Peter's] name. Matters stood in this way till the 3d of June 1815, when the sons, by appointment of their father, came to Carlisle to have deeds executed to them. A deed for the Cumberland works was offered by old Mr Ege to Peter, who refused it, as he was unwilling to give his bonds for 23,000 dollars, the amount his father required him to pay. George was then told by his father, "here is your deed; you can either receive it today, or wait till I can take some land from Peter's and add to yours: George objected to receiving it. Michael took his, and gave his bonds to his father for 48,000 dollars. Nothing was said on this day about the sons paying and receiving the debts at the different establishments. In August following, old Mr Ege had a survey made for the purpose of cutting off a part of the Cumberland estate and adding it to Holly, but died on the 31st of that month,

before any thing further was done.   Up to the death of his father, George continued at Holly, treating it as his own, and receiving the debts due to the works, and borrowing money in his own name, and paying those due by them, for which he was obliged afterwards to get vouchers, to settle with the estate.   Michael, after the receipt of his deed of the 3d of June 1815, continued to receive and settle the debts of the Carlisle works prior to that time, making no distinction between them and those of subsequent origin ; nor do the books indicate that any change of owners was made, the accounts being carried on as if he had owned the works before and after the deed was made.   The father, after January 1815, never settled any of the accounts of either of the establishments, nor paid any thing towards the buildings he knew his sons were putting up in the spring of that year.   The deeds to George and Peter were never delivered.

The orphan's court decided that the accountants should not be charged with this sum.

Michael Ege, Jun. paid John Wonderlich yearly, on the 1st of June, from 1816 till 1825, the sum of 66 dollars 67 cents, for which credit is claimed ; and also for 1111 dollars on the following facts.

In 1798 M. Ege, Sen. built a dam for the Carlisle works, which was then and still is used for said works.   This dam backed the water on the land of John Bricker, who, with Mr Ege, about the year 1802 made a verbal reference to Adam Brandt and two others, to fix the amount of damages sustained by Bricker from the flooding of his land.   The man reported, verbally, that Ege should pay Bricker 25 pounds (66 dollars 67 cents) per annum.   Ege, after the amount of damages was ascertained, wanted Bricker to have the matter put in writing, which Bricker refused ; but on the next day, when Bricker agreed it should be done, Ege replied, No, you would not do it yesterday, and I won't do it now.   I will pay you the 25 pounds per annum, but will make no writing about it.   The sum so fixed was paid by Mr Ege until June 1814, to Bricker as long as he owned the land, and afterwards to Wonderlich, to whom Bricker sold.   On the 3d of June 1815, as before stated, Mr Ege conveyed to his son Michael, and died the succeeding August.   The 25 pounds were regularly paid by Mr Ege, Jun. to Wonderlich until 1820, when the former procured a deed from the latter for the land that was injured by the dam.   The consideration given by Mr Ege for this land was forty-two acres of mountain land worth 6 dollars per acre.

The orphan's court struck out these credits.

The deed by Wonderlich is for the consideration of 2460 dollars, for the twenty-one acres one hundred and twenty-five perches the land overflowed, &c. &c.   After reciting specially the agreement to pay the 25 pounds, it conveys, assures, &c. &c. the said recited annual sum of 25 pounds, &c. and all his estate, &c. in and to the same, and makes Mr Ege his attorney, irrevocable, to ask, demand, &c. the same from all persons whom it may concern ; to sue, &c.

Items 150 and 151 were for 100 and 900 dollars.

III.—3 N

These two sums were lent by Mr Ege, Jun. to his father out of the money of Ann Galbreath, who was the ward of Michael Ege, Jun., and are so charged in an account book kept by him of Ann Galbreath's money; and are to be allowed or rejected by the court on the facts stated here, and those that are material in the former exceptions.

The orphan's court struck out these items.

Item No. 111. Paid Robert Coleman's account, per account and receipt, 2343 dollars 60 cents.

This payment was made to Robert Coleman for pig iron furnished to the Carlisle works before the 3d of June 1815. There was no account opened in the leger at those works, with Mr Coleman; but the iron when got from him was entered in the pig iron list, and the cash paid him was charged in the cash book as paid R. Coleman on account of pigs. After the death of Michael Ege, Sen., the balance of this account was paid by Michael Ege, Jun. and a receipt taken by him for it as administrator. It does not appear that he took receipts as administrator when he paid accounts prior to the 3d of June 1815 that were regularly opened with individuals. The former facts found, that are material, are referred to.

The true balance, says the auditor, if to be credited, is 2365 dollars 76 cents.

The orphan's court rejected this credit.

The orphan's court ordered an interest account to be added on the principle of debtor and creditor.

The bonds of Michael Ege to his father are charged in debit side of the account with other charges. The credits consist of 160 items, running in date from the 2d of September 1815 till 1825. Michael Ege, Jun. made various payments to Mary and Dr Chambers her husband, amounting to 5148 dollars 56 cents. Also to James Wilson husband of Eliza, amounting to 5592 dollars 45 cents. He has a large unsettled book account against George Ege. His executors have also several judgments against Peter Ege for money lent.

Errors.

1. In rejecting the credits on account of the dam, &c.
2. In rejecting Ann Galbreath's money.
3. In rejecting Coleman's debt.
4. In the decree as to interest.

*Alexander*, for appellants, on the point that the deed did not operate to release the estate from the money due to the ward of the grantee, cited 1 *Shower* 150; 5 *Bac. Ab.* 711, tit. *Release, letter* (*K*); Petre *v.* Clark, 11 *Serg. & Rawle* 377; *Toll. Law of Ex.* 134; Kirby *v.* Taylor, 6 *Johns. Cha. Rep.* 252; *Coke Litt.* 264 *a*; 2 *Rawle* 121; Scott *v.* Gallaher, 14 *Serg. & Rawle* 317.

*Williamson* and *Carothers*, for appellees, on the same point, cited

[Ege's Appeal.]

*8 Coke Rep.* 148; Green *v.* Huston, *8 Serg. & Rawle* 402; *7 Pick. Rep.* 244.

The opinion of the Court was delivered by

KENNEDY, J.—Four errors have been assigned, one of which only we think sustainable; it is the second, which alleges that the orphan's court erred in rejecting two items of credit claimed by the accountants, Nos. 150 and 151, the one 100 dollars and the other 900 dollars, with interest thereon, being money of Ann Galbreath, a minor, and ward at the time of Michael Ege, Jun., who, as her guardian, loaned it and put it out to interest to Michael Ege, Sen. There is no dispute but the money was so loaned; but it has been strenuously argued and insisted on, that some short time after it was loaned, Michael Ege, Sen. and Michael Ege, Jun. made and concluded an agreement between them, in pursuance of which Michael Ege, Sen., who was the father of Michael Ege, Jun., conveyed an estate in fee to the latter, estimated between them to be worth 148,020 dollars, 100,000 dollars of which was given as advancement by the father to the son, and for the remaining 48,020 dollars the son gave his bonds to the father securing the payment thereof; and that in the deed conveying the estate, which was signed and executed by both the parties, there is contained, *inter alia*, a release which embraces this money, and is in the following words: " it is understood by the parties that this deed is to operate as a complete and mutual bar, release and discharge of all claims and demands up to the date, including all transactions and debts of whatever nature, except the 48,020 dollars." The orphan's court thought that this clause of release in the deed was sufficiently comprehensive in its terms to embrace the money in question, and that it was so intended by the parties, and therefore refused to allow a credit to the accountants on account of it. Some few months after the execution of the deed, Michael Ege, Sen. died; and Michael Ege, Jun. accounted to his ward for the money. I cannot think that the money loaned by the son as guardian, to his father, was intended to be included in the release. The clause of release, as well as the whole deed, purports to deal merely with those things which the one or other of the parties had an absolute right to dispose of as he pleased, either for his own benefit or otherwise, and not what he held in trust or for the use of another. In the construction of deeds, as well as every other instrument in writing, it is important to attend to the subject matter of them in order to get at the intention of the parties, which, if lawful, ought to be effectuated by a suitable construction. It is a circumstance of some weight in this case, that when the money was lent, an intention on the part of Michael Ege, Jun. not to mingle or to confound his transactions as guardian with those of his own, is very clearly manifested by the form of the receipts which he took of his father as evidence of the money being lent. They show in the most explicit terms that he loaned it as guardian of

Ann Galbreath ; that the money belonged to her and not to him. And from this it also appears that Michael Ege, Sen., the borrower of the money, knew that it was not the money of his son.   And can it then be fairly inferred, taking this in connexion with the terms of the release, that it could have been the intention of the parties to have included the ward's money in it ?  There are certainly no words used which necessarily embrace it ; but, on the contrary, all the terms employed are more properly applicable to transactions between them in their own respective rights.   Nor can it be said that the subject matter of the deed or the release has any apparent relation to or connexion with the money of the ward.   And under these circumstances, it seems to me that it would not only be straining the terms of the release too far, but giving to it a construction that would be attended with very serious and dangerous consequences to the interests of wards, as well as that of their guardians.   Besides, I consider it an objection of no slight nature to the construction put on the release by the orphan's court, that it necessarily fixes upon the guardian the charge of the impropriety of either applying his ward's money to the payment of his own debts, or to the purchase of property for his own use, instead of keeping it out at interest for her benefit ; and that his father approved of his doing so.   We are certainly bound in charity to presume that nothing improper was intended, unless it be made to appear distinctly ; and I cannot persuade myself that it would be dealing fairly with the terms of the release in this case, to raise such an imputation by construction against the parties ; and certainly still less so with the high standing which each of them maintained in society.   I am, therefore, of opinion that credit ought to be allowed in the account for 1000 dollars, the amount of this money, with interest to be calculated thereon from the time it was loaned to the present time : that so much of the decree of the orphan's court as disallowed it be reversed, but that it be confirmed in every other respect.

Decree accordingly.